Okay, go ahead. Thank you. As I said, my name is Lee Udell, and I represent the appellant and plaintiff Paula Udell in this appeal from the district court's order affirming the administrative law judge's denial of her claim for disability benefits under the Social Security Act. There are two kinds of legal error in this case. The most important kind was the administrative law judge's errors in failing to provide legally sufficient reasons for rejecting evidence. And this affected both his treatment of medical opinion evidence and of witness testimony evidence. And what I would like to emphasize this morning is that this issue is controlled by several recent cases from this court, and these were provided to the court by the appellant's citation of supplemental authorities. The first of those cases is Garrison v. Colvin, and this goes to the administrative law judge's errors in his treatment, his rejection of medical opinion evidence. Just a reminder, the fundamental basis of Ms. Udell's disability claim was her brain injury, which resulted not only in left leg deformities, left ankle problems, pain, but also left-sided weakness. And that was clearly... Sorry, I didn't hear the last thing you said. Left what? Left-sided weakness. Okay. And that was the basis that appears in her disability application. So there are numerous references to these conditions in the medical reports in the record, but not a single one of them finds any mention in the administrative law judge's decision. And so it's clear from the Garrison v. Colvin case... This is an exceedingly odd case because she applied, as I understand it, and I'd like you to tell me if I'm right, she applied in 2009 for a disability period ending in 2000. I didn't even know you could do that. That is correct. It's just there's no limit on that? Not to my knowledge. Okay. And she had almost no medical records from the period before 2000, very little. That is correct. And you need medical records, whatever the other testimony may be, right? That is correct. You do need medical records. But the case law is very clear that the medical records themselves do not have to be generated before the date last insured. They have to tell you something about... They do have to bear on the conditions that existed at that time. Nobody is contesting that she had this injury and she had the left-sided weakness. The question is, what was its impact on her during the relevant time period? That's correct. And it seemed to me the supervening problem here is that there's almost nothing that tells us in terms of... And the burden is on the claimant in that regard, right? Right. That's correct. But I would disagree that the medical records tell you nothing of her condition during that period. The brain injury, the cerebral vascular accident, occurred in 1956. We know that. We also know that she was quite operative for quite a period of time. So, therefore, at some point, something had to change. And the question is, and certainly the ALJ was entitled to that conclusion, i.e., why was she able to be a teacher and so on, and now she isn't. So something about the medical records have to tell you that. And what tells you that? What tells you that? Well, I guess I would disagree with your first premise that we know she was quite active. What we know are labels. She held a job. We do know she held a job. But the nature of that... That one as well. Well, the nature of that job is something that one might draw many conclusions about without inquiring into the factual predicates for it. So she said that she was a teacher for 20 years. Well, what the record shows was that she was a substitute teacher for 15 years. And the earnings reports from that time show that her earnings were generally $2,000 to $3,000 a year. So I would submit that she did not work very many days of the month. Worked full-time for some period. She also worked full-time for some period. Now, that full-time, again, in her application indicated... The problem here is the absence of medical records, which is exacerbated by the fact that she did have full-time jobs at some time. So that's why I've just never seen a case like this. So the medical records, again, the conditions were chronic and long-standing. There was nothing you would seek treatment for. When you have cerebral palsy at the age of 3, it affects abnormalities that are with you for the rest of your life. I mean, it's permanent. And so you don't go in seeking treatment for a deformed foot and ankle or a leg-length disability or semi-paralysis, hemiparalysis in half your body. I mean, there's just nothing you can do to treat those conditions. So it's not surprising that there's not this long history. But I also suspect that the problem is one of records retention, that it just so happens that 10 years is too long a period. Whose problem is that? That's the problem. Well, the problem is that this is not an adversarial proceeding. And the administrative law judge had a... Jay can't go find records that don't exist either. No, he can't. But he could have taken steps to clarify the existing medical evidence. And specifically, the two records that do predate the expiration of her coverage were the 1999, June 1999 reports from Dr. O'Connell that specifically focus on her left hand. Now, a part... That was a fall, right? She was on a bike and she fell? You're correct, Your Honor, that almost every accident, every medical report is the result of a fall. And the doctor concluded that it was short-lived and she was on the way to recovery. Actually, let me back up. You're referring to Dr. O'Connell's reports examining her right hand. So there were two of those, and they were for falls. I think one was 2001 and perhaps one was 2000. What I'm referring to is her left hand, and that was not because of a fall. That was when Dr. O'Connell noted that she comes in with a new complaint of numbness in her left hand. These symptoms have been getting worse for two to three years, which in 1999, that would put the onset of symptoms in about 1996. And she's reporting dropping things, and this is getting worse, and this is a result of her cerebral palsy and her left-sided weakness. And so that is in 1999, before the expiration of coverage. So, again, the reports show that there were a great many abnormalities and impairments all relating to this left-sided weakness or hemiparesis that existed throughout her life. And the fact that she was able to be a resource teacher in a small class, you know, with a group of five children helping them read does not indicate that she was very able-bodied. And the important thing here is that it's undisputed, there's no dispute, that she had at least five severe impairments and that she was not, she was limited to less than the full range of sedentary work and that she was not capable of doing her prior work. So when you're limited to less than the full range of sedentary work, you need to have good use of both hands in order to do the occupations that are out there. So the real crux of the case was whether the judge properly rejected her testimony that she could only use her right hand, and this was the one where he found a severe impairment. He found, you know, that she had it rebuilt after falling on it so many times, whether she could use that more than two-thirds of the day and whether she could use her left hand less than one-third of the day. So when she gave the testimony that she had those limitations and couldn't use her hands, the vocational expert was very clear that if you incorporated those restrictions in the residual functional capacity that the judge found, and this is again without even making findings of brain injuries, but if you just incorporated those restrictions, it eliminated all other work in the economy. There was nothing that she could do. So the import of the medical evidence is that this left-sided weakness was it was observed, there were clinical observations and impressions of it, there is nothing, you cannot read the evidence and see anything that indicated some new or acute onset. All of those medical reports that post-date the coverage, yes, they deal with falls. She kept hurting herself, but they don't, they note in the course of just saying, oh, all these little falls are minor and they'll resolve, they do not dispute that she had a long chronic condition of left-sided weakness that affected her ability to, as I say, use her hands. There was also testimony and medical evidence that it affected other abilities, her vision and her communication skills. But for purposes of this appeal, the court really doesn't need to go beyond ruling that the judge erred in rejecting her testimony and her family's testimony about her ability to use her hands. So again, I'd just like to stress that the rejection of this medical evidence was completely improper under Garrison v. Colvin to not even mention, to disregard without even mentioning the evidence as legal error, and that was clear. And also Judge Gould's recent decision in Marsh v. Colvin to the same effect. You must give reasons for rejecting a treating doctor's opinion, and so it stands to reason that even if the judge was entitled to reject these records, he had to at least mention them, and he did not do that. And secondly, on the credibility determination, to reject Paula's testimony, again, he made a boilerplate determination. It was expressed, but the exact language of that determination was just before this court in Treichler v. Commissioner. It adjudicated the exact language that that is not a sufficient credibility determination. It fails to meet the legal standard of specifically identifying the testimony and then providing clear and specific reasons for rejecting it. So I think it's clear under the court's precedence that this case has these legal errors and the decision must be reversed. Now, again, they're not harmless error because there's no dispute that she had these severe impairments, that she had these restricted abilities, that the occupational base open to her was very restricted, and then if you add in this testimony, there are no jobs, and the vocational expert was clear. So the other recent case, again, Garrison recently reexamined and reaffirmed this court's long-settled credit as true rule. So the appropriate remedy in this case is for reversal and remand for calculation and award of benefits. There's no need for further proceedings specifically because the dispositive issue about her ability to use her hands was fully developed. And if the testimony is credited as true, the vocational expert already testified there's no jobs available, the administrative law judge would have had no choice but to find her disabled within the Social Security Act. Thank you. I'd like to reserve the rest of my time for questions. Good morning, Your Honor. Clara Brott on behalf of the government. May it please the Court. I'd like to start by addressing a couple of the factual matters that the claimant raised. First, the occupation as a school teacher. The allegation that she was a substitute teacher is refuted in the record by claimant's own statements in a form that she filled out when she was applying for benefits. I'm sorry, I don't have the page number. I'm not sure what difference it makes, but that the earnings records show that most years she made $2,000 or $3,000. I think that is, we have to go by what the earnings records say, but she said herself that she was working five days a week for six hours a day. It seems I was really, this is really a bad, sometimes she was and sometimes she wasn't. I think that's probably fair to conclude, but it is clear that she was working as a teacher, which is skilled work requiring a college education, and it's, as you said, a good job, and it's light work. So we know that whatever her limitations were from the injury she alleges that she had as a child, she was able to work there. The answer is I did not find her capable of doing that job, I guess as of 2000, is that right? Maybe 1996, 1995. She was not capable of that job as of 2000, that's right. Just reading the testimony, it appears to me that there are some cognitive issues with respect to her testimony as well that I think would explain the difference. I'm not sure if I would agree with that. But I don't think that, that does not establish mental limitations and there's no medical evidence whatsoever of any mental limitations. So we clearly don't have the medical and objective evidence necessary to make any finding like that. Especially not during the time, as you've noted, she applied for benefits almost 10 years after the end of her insured period. Well, during her insured status up to 2000, September of 2000, we've heard Dr. O'Connor's visit and his notes, noting this palsy and the left side weakness and these impairments that ultimately were found by the LJ. I'd like to make a point about those notes during the insured period, specifically from Dr. O'Connor in 1999 and 2000. Those notes are made in the historical portion of the opinion where the doctor takes the history from the patient and he, I believe, is recounting how the claimant is describing her condition from childhood. He's treating her for bumps and bruises, strains from falls, as you noted. He's not treating cerebral palsy and I think the record is very, very limited on that. I actually want to point out that the claimant made a notation, or a point about the duration of the tingling in the left hand. She said two to three years and worsening. That's on page 332, just a few pages before from the same event, the same day or within the same couple of days when she's getting examined for this complaint. She says it started a month before or maybe a year before. That just goes to show that these are her subjective reports about when this happened. What is true is that this is an extremely truncated ALJ opinion. He didn't mention the cause of her original problem or the fact that it was chronic and continuing. He didn't mention, he didn't say what he, I mean he mentions the lay testimony but he doesn't say whether he credited or didn't credit it. He doesn't mention any of the post-2000 medical evidence, including its existence. One can assume that that meant he thought it wasn't pertinent and I gather the law is that it can be pertinent. Is that right? That's right that it can be pertinent. I think it's also right that he thought most of it wasn't pertinent. He even mentions existence? He refers to a record from 2001. I'll point that out for you. The last paragraph on page 36 of the record, page 4 of the opinion, he's referring to 2001. It's also very clear from the transcript that he understands the relevance of that information and that he should look at it. It's clear that he did from the transcript. But that it's only relevant to the extent it's able to show her limitations during the insured period, which it does not. Okay, go ahead. Just returning to the main point, it's the claimant's burden to prove disability and for reasons that we don't know, she waited a very long time before filing this claim. She hasn't been able to provide contemporaneous evidence. The statute simply requires some medical proof of the disability during the insured period, before the close of that period, and her own reports are just not enough. The only evidence that we have of manipulative limitations during the insured period are her statements to that effect in the testimony, and there is just not enough medical proof for the agency to make a finding of disability during the period when she was insured. Counsel, Judge Gould, if I could interject a question. Is there any case that says she... that says she... that says she can't apply after a long time? No, sir. No, Your Honor, there is not. She can apply. There's no limit on that. Of course, practically it is limited by what she can prove at that point, but no, she's able to bring the case. Just a question of the quality of the proof. That's correct. Okay, thank you. I agree that the ALJ did not say, I discredit the lay testimony for reasons XYZ. I think that read in the context, the ALJ recites the testimony, then provides the medical evidence that shows she has no functional limitations in the wrist, and a couple of other points that would support... But no, you're right, the ALJ doesn't... The case law or the regulations, I mean, we're so used to seeing all this medical evidence, is it required? I mean, suppose the individuals had just gotten up and testified and the ALJ had believed them. Could that be enough? No, it's not enough. The regulations require that there must be medical findings and objective data that first show the existence of an impairment, and then only then can you look to the... But he didn't find there wasn't an impairment. This is the shortest ALJ opinion I've ever seen. It's quite short. And he did not find that the brain injury rose to the level of a severe impairment. And I think the reason, as you say, it's a short opinion, is that there was simply not enough medical evidence during the relevant period to find that. So that's sort of the game over. I mean, if he did that right. But the problem is he didn't explain himself very well. That's right. I agree there could have been more detail in the opinion. But yes, there must be medical evidence first. So as to discrediting the lay evidence, I guess, I mean, usually you have medical evidence and then you have lay evidence as to have the impact of whatever is in the medical evidence. And the rule is generally that he can discredit it if it's inconsistent with the medical evidence or if it's inconsistent with... So if there isn't medical evidence to be inconsistent with, I mean, I guess that's what he was thinking, that there just wasn't a foundation to even compare the... Yes. And I think that there is at least... There were two reasons that he discredited the testimony in general. Well, he didn't say what they were. You're guessing. I'm not guessing. I'm inferring from the last paragraph here on page 36 of the opinion where he says the medical records are sparse and then goes on to discuss one of Dr. O'Connell's findings in particular that the pain in her wrist that remained following this surgery from years before did not limit her functioning. He's saying we have this testimony about the inability to type for long periods of time. We have the claimant's testimony that she can only use her hands for certain periods of the day, but there's not enough evidence in the file to show that. And in fact, there's this contrary finding of functionality. Anything else? That's all I have, Your Honor. Thank you very much. What would be helpful to me is to know what specific part of the medical evidence from post-2000 you thought was pertinent and should have been dealt with. Okay. That's set out in the opponent's opening brief at pages 43 and 44 with numerous sites to the record. I'll just read for one example. This is at page 108 of the excerpts of record, and it is a report from 2002. I'm sorry, it begins at page 107. So this is a report by Dr. Gore, and again, it's from another fall, and she's hurt herself. But what Dr. Gore says is first he recites the history, her history, her status post-cerebral vascular accident, her brain injury. And that appears in the interim history at page 107. But then at page 108, under impression, which I believe is medical speak for diagnosis, it says she has not only a probable bruise of her left hip, but it says status post-trauma as described. So the point is, and that's just one example, but in the brief that's laid out, first the medical records, they do contain her own statements reporting her history. But then they record the doctor's own observations of anatomical and physiological factors and anatomical abnormalities, which are signs of the brain injury. The clinical observations are set forth, including the anatomical deformities of her left side. Also, the observation of numbness, weakness, and lack of sensation on her left side. Also, spasticity, scissoring gait, tilted optic nerves on her left side, and dysarthric speech. And you think that the ALJs simply did not exhibit awareness of that chronic condition? There is nothing to indicate that he was aware of the resulting complications. Now, again, there's nothing. Was he aware of his existence? He was aware. There's nothing in the decision that would tell you that, but during the hearing, he displayed that he was aware she'd had an accident. So it was interesting because the district court, in her opinion, said, oh, he was aware of her brain injury and its resulting complications. But what he said in the hearing didn't show any awareness of resulting complications. It says, what he said in the hearing was, I know about her three-year-old accident. I've read about it somewhere. I don't want to hear about it. And that's the only statement by the administrative law judge about that condition. So, again, I'd like to just address a couple things. The counsel was talking about inferences that could be made to support the credibility determination. The court's recent decisions in Brown-Hunter v. Colvin and Burrell v. Colvin make clear that that does not substitute for the requisite statement of reasons, specific clear and convincing reasons. Further, just drawing inferences from the record also does not substitute for a statement of reasons. And going back to the information about how much she worked, I think that disability application saying she worked five days a week is probably best viewed as that was her last position before she stopped working. But the nature of the work she described is she used her hands no more than two hours a day. And the vocational expert was very clear that that wouldn't cut it. If you're limited to sedentary work, unskilled, you have to have good use of both hands. Further, again, the counsel remarked that she wasn't seeking treatment for her cerebral palsy or hemiplegia. There's no treatment. I mean, those are permanent and irreversible conditions. They're not something you seek treatment for. Thank you very much. Thank both of you for really, and I seem to be saying this a lot today, but an unusual, useful argument in a Social Security case. Thank you. The case of Udell v. Colvin is submitted, and we will take a short break.
judges: Gould, Berzon, Steeh